UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

No. 1:24-cv-00502

**Etison LLC,**
*Plaintiff,*

v.

**HighLevel, Inc.,**
*Defendant.*

# OPINION AND ORDER

Before the court is defendant's motion to dismiss for failure to state a claim (Doc. 21). The motion turns on whether the patents in suit—describing a website-creation system—concern abstract ideas that are patent ineligible under 35 U.S.C. § 101. For the reasons set forth below, defendant's motion is granted, and this case is dismissed.

**I. Background**

Plaintiff Etison LLC, doing business as ClickFunnels, owns by assignment Patent Nos. 10,846,357 and 11,361,047, two related patents that describe a "website creation system for creating websites having at least one series of directional webpages and related methods." Docs. 19-1 at 1:1–4 ('357 patent), 19-3 at 1:1–4 ('047 patent). Plaintiff brought this action against defendant HighLevel, alleging infringement of "at least" claim 1 of both patents. Doc. 19 at 11–12. Plaintiff did not name with specificity any additional claims that are accused of being infringed.

Each claim 1 is largely equivalent. It describes a system that—in response to a user selecting the option to create a website—displays a plurality of website types, each including a series of directional webpages to entice end-user interaction. Docs. 19-1 at 35:50–36:2, 19-3 at 36:17–29. Once a user selects a website type, the system then displays a plurality of website templates based on the selected website type. Docs. 19-1 at 36:3–7, 19-3 at 36:32–35. After the user selects a particular website template, the system

generates and launches a generic website based on the selections. Doc. 19-1 at 36:8–20, 19-3 at 36:36–40. Claim 1 of the '357 patent also includes a website editor graphical user interface that allows users to customize the generic website. Doc. 19-1 at 36:12–27.

In total, the '357 patent consists of three independent and seventeen dependent claims. Independent claim 12 is a system claim comprising "at least one processor" and "at least one non-transitory computer-readable storage medium storing instructions thereon that, when executed by the at least one processor, cause the system to" perform the steps in claim 1. Doc. 19-1 at 37:7–58. Independent claim 16 describes a "non-transitory computer-readable medium storing instructions thereon that, when executed by at least one processor, cause the at least one processor" to perform the steps in claim 1. *Id.* at 38:3–49. "The ['357] patent's dependent claims include additional limitations that address media objects or graphical user interface elements on a webpage (claims 2, 9, 11, 13, 15, 17); display additional webpages to a user in a single tab . . . (claims 3–5, 18); assign values to guests (claim 4); organize webpages in a certain sequence (claims 6–7, 19–20); restrict website access based on certain user criteria (claims 8–9, 11); restrict website access based on certain user criteria (claims 8–9, 11); or send a communication (claims 10, 14)." Doc. 22 at 9.

Below is claim 1 of the '357 patent in full:

**1.** A method, comprising:

providing, to a user for display on a client device, via a website creation system, a user dashboard comprising a selectable option to create a website;

receiving a selection of the selectable option to create a website;

in response to receiving the selection of the selectable option to create a website, providing, to the user for display on the client device, a plurality of website types for selection;

> receiving a selection of a website type of the plurality of website types,
>
> wherein each website type of the plurality of website types comprises a series of directional webpages configured to cause an end user interaction with a website,
>
> wherein the series of directional webpages of each website type of the plurality of websites types comprises a unique plurality of sequential webpages configured to be provided sequentially one after another;
>
> in response to receiving the selection of a website type of the plurality of website types, providing, to the user for display on the client device, a plurality of website templates for selection, the plurality of website templates being particular to the selected website type;
>
> receiving a selection of a website template of the plurality of website templates and the series of directional webpages of the selected website type;
>
> in response to receiving the selection of a website template, generating and launching a generic website based on the selected website type and selected website template and providing, to the user for display on the client device, a website editor graphical user interface, the website editor graphical user interface comprising a plurality of webpage tabs, each webpage tab of the plurality of webpage tabs representing a webpage of the series of directional webpages;
>
> receiving at least one indication of a user interaction editing at least one webpage of the series of directional webpages; and
>
> in response to receiving the at least one indication of a user interaction editing at least one webpage of the series of directional webpages, editing the launched generic website to create a customized website.

Doc. 19-1 at 35:51–36:27.

The '047 patent similarly consists of three independent and seventeen dependent claims. Independent claims 14 and 18 of the '047 patent include the same limitations as claim 1 but in system form and in "non-transitory computer-readable" form, respectively. Doc. 19-3 at 37:26–56, 38:16–41. "Similar to its sister patent, the ['047] patent's dependent claims include the same additional limitations that address the design or display of the website or webpage (claims 2–4, 12, 16–17); display additional webpages to a user in a single tab . . . (claims 5–8); assign values to guests (claim 7); organize webpages in a certain sequence (claims 9–10, 15, 19–20); restrict website access based on certain user criteria (claims 11–12); or send a communication (claim 13)." Doc. 22 at 10–11.

Below is claim 1 of the '047 patent in full:

**1.** A method, comprising:

receiving a selection to create a website;

responsive to receiving the selection to create a website, providing a plurality of website types for selection,

wherein each website type of the plurality of website types comprises a series of directional webpages configured to cause an end user interaction with a website, and

wherein the series of directional webpages of each website type of the plurality of website types comprises a unique plurality of sequential webpages configured to be provided sequentially one after another;

receiving a selection of a website type of the plurality of website types;

responsive to receiving the selection of a website type of the plurality of website types, providing a plurality of website templates for selection, the plurality of website templates being particular to the selected website type;

receiving a selection of a website template of the plurality of website templates; and

> in response to receiving the selection of a website template, generating and launching a website based on the selected website type and selected website template.

Doc. 19-3 at 36:18-40.

According to plaintiff, the asserted invention provides benefits over prior-art systems where users were often required to "hire two or more different companies to develop and generate different portions of the website." Doc. 19 at 3 (quoting Docs. 19-1 at 1:15–19, 19-3 at 1:23–27). The patent specifications claim that "[b]ecause the website creation system of the present disclosure enables a user to create, within a single system, a website that includes at least one series of directional webpages ordered and designed to entice particular user interaction, the website creation system is advantageous over conventional website creation systems." Docs. 19-1 at 3:18–23, 19-3 at 3:26–31. In addition, because of this streamlined functionality, "the [claimed] website creation system reduces required processing power, memory, and communication resources needed to facilitate creating websites." Docs. 19-1 at 3:24–28, 19-3 at 3:32–36.

Defendant has moved to dismiss for failure to state a claim, Doc. 21, arguing that the patents concern abstract ideas and are therefore subject-matter ineligible, Doc. 22 at 7. Specifically, defendant asserts that claim 1 merely describes the common process of filtering information based on user preferences to generate a website. *Id.* Plaintiff responds that that this is an oversimplification because claim 1 describes "particular features performed in a particular order" that will ultimately enhance computer performance. Doc. 24 at 8. The court heard argument on the motion on January 24, 2025, and now decides it.

## II. Analysis

"Patent eligibility under 35 U.S.C. § 101 is ultimately an issue of law" and is thus generally amenable to resolution at the motion-to-dismiss stage. *Mobile Acuity Ltd. v. Blippar Ltd.*, 110 F.4th 1280, 1289 (Fed. Cir. 2024). Although "patent eligibility . . . may involve underlying questions of fact," a patent "may be determined

ineligible at the Rule 12(b)(6) stage when there are no factual allegations that, taken as true, prevent resolving the eligibility question as a matter of law." *Simio, LLC v. FlexSim Software Prods., Inc.*, 983 F.3d 1353, 1358–59 (Fed. Cir. 2020) (quotation marks omitted).

### A. Preliminary considerations

#### 1. Representativeness

According to defendant, claim 1 of the '357 patent is representative of all claims of both asserted patents. Doc. 22 at 12–13. "Limiting the analysis of a § 101 challenge to representative claims is proper when the claims at issue are 'substantially similar and linked to the same' ineligible concept." *Mobile Acuity*, 110 F.4th at 1290 (quoting *Cleveland Clinic Found. v. True Health Diagnostics LLC*, 859 F. 3d 1352, 1360 (Fed. Cir. 2017)). To contest a reasonable assertion of representativeness, the patent owner must present "a non-frivolous argument that the eligibility of the purported representative claim does not fairly represent all claims in the group for purposes of eligibility." *Id.* at 1291. Once this showing is made, "the patent challenger bears the burden to prove either that (i) the representative claim is, in fact, representative . . . ; or (ii) each separate claim . . . is ineligible for patenting." *Id.*

Plaintiff argues that claim 1 of the '037 patent is not representative because it "does not include the limitations of Claim 13 of the '357 patent and Claim 16 of the '047 patent of one or more triggers and at least one event that results from the one or more triggers." Doc. 24 at 10 (quotation marks omitted) (citing Docs. 19-1 at 37:59–62, 19-3 at 38:6-10). However, these limitations only "introduce conventional computer activities," namely, the triggering of an event in response to an action by a user. *Mobile Acuity*, 110 F. 4th at 1291. Furthermore, "the other independent claims in each patent merely recite the steps performed in claim 1 of their respective patent but in the form of a 'system' or 'non-transitory computer-readable medium' claim." Doc. 14 at 13. Plaintiff has

thus failed to provide any nonfrivolous argument as to why claim 1 of the '357 patent is not representative.

Even going beyond plaintiff's arguments on this point, however, the only significant difference between claim 1 of both patents is that claim 1 of the '357 patent features a website editor graphical user interface. *Compare* Doc. 19-1 at 35:51–36:27, *with* Doc 19-3 at 36:18–40. However, the mere possibility of editing the generic website—a conventional computer function—does not change the ultimate eligibility analysis or the underlying idea at the center of both patents: a website-creation system where users select from an array of website types and templates to arrive at a generic website. Indeed, because claim 1 of the '047 patent is otherwise equivalent, it cannot survive an eligibility inquiry if claim 1 of the '357 patent is ineligible—the less detailed claim cannot survive if the more detailed fails. Both patents also share a common specification, which provides "some additional indication of representativeness." *See PPS Data, LLC v. Jack Henry & Assocs. Inc.*, 404 F. Supp. 3d 1021, 1035 (E.D. Tex. 2019). The court concludes that claim 1 of the '357 patent is representative of all claims of both asserted patents.

### 2. Claim construction

Plaintiff argues that "at least the following terms need to be construed: 'a series of directional webpages,' 'a unique plurality of sequential webpages,' and 'triggers.'" Doc. 24 at 11. However, as defendant points out, Doc. 28 at 6, the Federal Circuit recently held that "[t]o defeat a motion to dismiss based on the purported need for claim construction, a patentee must propose a specific claim construction and explain why any dispute must be resolved before the scope of the claims can be understood for § 101 purposes." *Mobile Acuity*, 110 F.4th at 1293–94 (cleaned up). Plaintiff has failed to explain why these terms would need construction or how any dispute over their meaning would materially change the § 101 analysis. Furthermore, this is a case where any claim construction would "involve[] little more than the application of the widely accepted meaning of commonly understood words."

*Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) (en banc). Accordingly, the court concludes that claim construction is not necessary here.

### B. Patentability

Patentable subject matter is defined under the Patent Act: "Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title." 35 U.S.C. § 101. The Supreme Court has "long held that this provision contains an important implicit exception: Laws of nature, natural phenomena, and abstract ideas are not patentable." *Ass'n for Molecular Pathology v. Myriad Genetics, Inc.*, 569 U.S. 576, 589 (2013) (cleaned up).

When analyzing patentability under § 101, a court should first "determine whether the claims at issue are directed to one of those patent-ineligible concepts." *Alice Corp. Pty. v. CLS Bank Int'l*, 573 U.S. 208, 217 (2014) (citing *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 566 U.S. 66, 77–78 (2012)). If this is indeed the case, the court should then consider whether the elements of each claim—"both individually and 'as an ordered combination'"—describe an "inventive concept" that is "sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself." *Id.* at 217–18 (alteration in original) (quoting *Mayo*, 566 U.S. at 72–73). Importantly, a court need not proceed to this second step if the claims are not directed to patent-ineligible concepts and thus satisfy *Alice* step one. *See Visual Memory LLC v. NVIDIA Corp.*, 867 F.3d 1253, 1262 (Fed. Cir. 2017).

#### 1. *Alice* step one

To determine whether claims are "directed to patent-ineligible subject matter," such as an abstract idea, the court should "look to the character of the claims as whole," including the patent's specification. *Broadband iTV, Inc. v. Amazon.com, Inc.*, 113 F.4th 1359, 1367 (Fed. Cir. 2024) (citing *Enfish v. Microsoft Corp.*,

- 8 -

822 F.3d 1327, 1335 (Fed. Cir. 2016)). Under *Alice* step one, the inquiry "often turns to the question of what the patent asserts as the claimed advance over the prior art." *Id.* In other words, "whether the claims 'focus on a specific means or method that improves the relevant technology or are instead directed to a result or effect that itself is the abstract idea and merely invoke general processes and machinery.'" *CardioNet, LLC v. InfoBionic, Inc.*, 955 F.3d 1358, 1368 (Fed. Cir. 2020). Additionally, the Supreme Court and Federal Circuit "have repeatedly made clear that merely limiting the field of use of the abstract idea to a particular existing technological environment does not render the claims any less abstract." *Affinity Labs of Tex., LLC v. DIRECTV, LLC*, 838 F.3d 1253, 1259 (Fed. Cir. 2016).

"Distinguishing between claims that recite a patent-eligible invention and claims that add too little to a patent-ineligible abstract concept can be difficult, as the line separating the two is not always clear." *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1255 (Fed. Cir. 2014). Thus, the abstractness line is best discerned by considering illustrative precedent from the Supreme Court and Federal Circuit. For example, in *Alice*, the Supreme Court held that the "use of a third party to mitigate settlement risk" was an abstract idea because "the concept of intermediated settlement is 'a fundamental economic practice long prevalent in our system of commerce.'" 573 U.S. at 219 (cleaned up) (quoting *Bilski v. Kappos*, 561 U.S. 593, 611 (2010)).

More relevantly, the Federal Circuit has held that a computer system for monitoring electric grids was directed to the abstract idea of "collecting information, analyzing it, and displaying certain results of the collection and analysis." *Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1353 (Fed. Cir. 2016); *see also, e.g.*, *IBM v. Zillow Grp., Inc.*, 50 F.4th 1371, 1378 (Fed. Cir. 2022) (concluding that filtering map data based on a user selection is abstract); *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 714–15 (Fed. Cir. 2014) (holding that a claim describing 11 steps for selecting and displaying "an advertisement in exchange for access

to copyrighted media" is abstract); *Broadband*, 113 F.4th at 1368 (holding that "receiving metadata and organizing the display of video content based on that metadata is abstract"). Similarly, the Federal Circuit has reasoned that a method of manipulating computer data to combine and display previously incompatible documents in an editable format is unpatentable because "the underlying concept . . . merely encompasse[d] the abstract idea itself of organizing, displaying, and manipulating data of particular documents." *Intell. Ventures I LLC v. Cap. One Fin. Corp.*, 850 F.3d 1332, 1341 (Fed. Cir. 2017).

As defendant points out, Doc. 22 at 16–17, the District of Delaware has found "offering more meaningful information to an individual based on his own preferences" to be abstract. *Sound View Innovations, LLC v. Facebook, Inc.*, 204 F. Supp. 3d 655, 662 (D. Del. 2016) (holding that "offering more meaningful information" to Facebook users based on user preferences and related community groups is abstract); *see also IPA Techs., Inc. v. Amazon.com, Inc.*, 307 F. Supp. 3d 356, 367 (D. Del. 2018) (holding that "transmitting electronic data to a user in response to a spoken request from the user" is abstract).

Conversely, in *DDR Holdings*—which plaintiff relies upon— the Federal Circuit held that a composite webpage combining "certain visual elements of a 'host' website with content of a third-party merchant" was not abstract. 773 F.3d at 1248, 1259. Specifically, the Federal Circuit noted that this was an "inventive concept for resolving [the] particular Internet-centric problem" of retaining website visitors that would normally be transported away from a host website when clicking on an advertisement. *Id.* at 1259.

According to defendant, claim 1 of the '357 patent falls on the abstract side of this line because it only "gathers selection criteria, presents it to a user, then based on the user's selections, displays the results." Doc. 22 at 14. Plaintiff responds that this is an "oversimplification" and "runs afoul of the Federal Circuit's warning" that "describing the claims at such a high level of abstraction and

untethered from the language of the claims all but ensures that the exceptions to § 101 swallow the rule." Doc. 24 at 7, 13–14 (quoting *Enfish*, 822 F.3d at 1337).

The court agrees that claim 1 is directed to an unpatentable abstract idea. To review, claim 1 describes a method where a user is presented a plurality of website types and, after making a selection of a particular website type, is then presented with a plurality of website templates. Doc. 19-1 at 35:51–36:27. After the user selects a template, a generic website is launched. *Id.* Finally, the user can make edits through a website editor graphical user interface to arrive at a final, customized website. *Id.*

At base, this is an example of filtering information based on user preferences to arrive at a final result. Like the third-party settlement mitigation in *Alice*, 573 U.S. at 219, "[t]he concept of data collection, recognition, and storage is undisputedly well-known." *Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*, 776 F.3d 1343, 1347 (Fed. Cir. 2014).

Indeed, plaintiff's attempt to distinguish *IBM*, one of defendant's best cases on this point, is unavailing. In *IBM*, the Federal Circuit determined that the claims were directed to "presenting a map, having a user select a portion of that map, and then synchronizing the map and its corresponding list to display a more limited data set to the user." *IBM,* 50 F.4th at 1378. Plaintiff argues that claim 1 here does not "simply display 'information' from which a user can 'drill down' to obtain a subset of that information," and notes that a website type "comprises a series of directional webpages," each of which "comprises a unique plurality of sequential webpages." Doc. 24 at 16. However, it is not clear how these limitations on the overall set of data render the overarching process of filtering website types and templates based on user preferences any less abstract. *See Intell. Ventures I*, 850 F.3d at 1341 (holding that, although the use of certain data might "add a degree of particularity to the claims," the "underlying concept" of manipulating and displaying data was still abstract).

*DDR Holdings* does not carry the day for plaintiffs because that case featured an unconventional technological solution to "override[] the routine . . . sequence of events ordinarily triggered by the click of a hyperlink." 773 F.3d at 1258. The solution here—allowing users to choose from a selection of website templates and types—is as conventional as choosing a vendor. Plaintiff implies that its claims are similar to those in *DDR* because both address problems unique to the internet—for example, users visiting multiple online vendors to design different parts of a website. Doc. 24 at 16. However, although website creation is unique to the internet, visiting multiple vendors to design a product is not. The idea of providing consumers an array of products that include discrete, combined components dates back to antiquity. As the Federal Circuit in *DDR* cautioned, "not all claims purporting to address Internet-centric challenges are eligible for patent." 773 F.3d at 1258.

Plaintiff notes that the Federal Circuit has "found [patentable] a technical advantage 'with minimal user input.'" Doc. 24 at 14 (quoting *CosmoKey Sols. GmbH v. Duo Sec. LLC*, 15 F.4th 1091, 1097 (Fed. Cir. 2021)). Specifically, in *CosmoKey*, the Federal Circuit considered an authentication method where a user activates an authentication function on a mobile device. 15 F.4th at 1093–94. The district court had concluded that the claims were directed to the abstract idea of authentication. *Id.* at 1097. The Federal Circuit cautioned against overgeneralizing claims, pointing out that "the claims and written description suggest that the focus of the claimed advance is activation of the authentication function, communication of the activation within a predetermined time, and automatic deactivation of the authentication function." *Id.* However, the Federal Circuit also explicitly declined to answer whether this constituted an abstract idea. *Id.*

Regardless, the focus of the claim here is to design a website by going through multiple, iterative steps where users select website types and templates. Far from the new authentication function in *CosmoKey*, filtering website types and templates based on

user preferences to arrive at a final generic website is undoubtedly abstract. The court thus proceeds to step two of *Alice*.

### 2. *Alice* step two

In *Alice* step two, the court considers whether the claim contains an "inventive concept" that is "sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself." *Alice*, 573 U.S. at 217–18 (alteration in original). "A claim that recites an abstract idea must include additional features to ensure that the claim is more than a drafting effort designed to monopolize the abstract idea." *Id.* at 221 (cleaned up). For example, in *Mayo*, "methods for determining metabolite levels were already 'well known in the art,' and the process at issue amounted to 'nothing significantly more than an instruction to doctors to apply the applicable laws when treating their patients.'" *Id.* at 221–22 (quoting *Mayo*, 566 U.S. at 79). So too in *Alice*, where "the claims at issue amount[ed] to nothing significantly more than an instruction to apply the abstract idea of intermediated settlement using some unspecified, generic computer." *Id.* at 225–26 (quotation marks omitted).

Plaintiff argues that the claims are inventive because they include technical solutions such as website types comprising a series of directional webpages. Doc. 24 at 18. According to plaintiff, these solutions allow a user to create a website in one system, allegedly improving the computer system itself through "reduce[d] required processing power, memory, and communication resources needed to facilitate creating websites." *Id.* at 19 (alteration in original) (quoting Doc. 19-1 at 3:27–28). The patent specification suggests that this "results in less data transfer and data bandwidth usage." Doc 19-1 at 3:29–31.

Plaintiff's argument, however, is fatally undermined by the Federal Circuit's reasoning in *Intellectual Ventures I*. There, the court concluded that a process for combining different online document types into a single, editable dynamic document did not feature an inventive concept. *Intell. Ventures I*, 850 F.3d at 1342. The court reasoned that the claims in that case "recite[d] no more than

routine steps of data collection and organization using generic computer components and conventional computer data processing activities." *Id.* So too here. Directional and sequential webpages as well as website types and templates are all generic computer functions or data types. As plaintiff itself admits, it "does not claim to have invented webpages." Doc. 24 at 21; *see also Bascom Glob. Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1349 (Fed. Cir. 2016) (finding that claims recited "generic computer, network and Internet components" where plaintiff "[did] not assert that it invented local computers, ISP servers, networks, network accounts, or filtering"). Claim 1's reference to a website editor graphical user interface is also not inventive. *See Intell. Ventures I*, 850 F.3d at 1341. The specification also does not describe any of these components as inventive.

Additionally, the claims here are distinguishable from cases where an inventive concept has been found. For example, in *Amdocs (Israel) v. Openet Telecom*, the technological improvement "depend[ed] not only upon the invention's distributed architecture, but also . . . upon the network devices and gatherers—even though these may be generic—working together in a distributed manner." 841 F.3d 1288, 1301 (Fed. Cir. 2016). In other words, *Amdocs* turned on a finding that generic components were working together in an inventive way. *See also Bascom*, 827 F.3d at 1349–50 (holding that the "non-conventional and non-generic arrangement of known, conventional pieces" made otherwise generic computer components inventive). Here, instead, any improvement in computer function flows not from how directional and sequential webpages are combined. Rather, the improvement comes from the filtering of already-existing data structures upon the selection of a user.

Simply put, the claims here "merely recite the abstract idea of filtering content along with the requirement to perform it . . . on a set of generic computer components." *Id.* at 1350. According to the patent specification, the alleged improvements in computer function stem from the fact that the system here allows a user to

create a website including directional webpages within a single system. Doc. 19-1 at 3:18–40. This result is achieved because the website templates all include directional webpages. However, there is no explanation as to how such templates are created based on the directional webpages. The claims here present "only a result-oriented solution, with insufficient detail for how a computer accomplishes it." *Intell. Ventures I*, 850 F.3d at 1342.

The court concludes that the facts here, even when viewed most favorably to plaintiff, fail to establish a patentably inventive concept. Thus, the patents fail *Alice* step two, and they are subject-matter ineligible.

## III. Conclusion

The court concludes that the '357 patent and the '047 patent are directed to patent-ineligible material under case law interpreting 35 U.S.C. § 101. Therefore, defendant's motion to dismiss (Doc. 21) is granted, and the amended complaint (Doc. 19) is dismissed with prejudice. Any pending motions are denied as moot.

*So ordered by the court on March 31, 2025.*

J. CAMPBELL BARKER
United States District Judge